CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2017 JAN 17  AM 9: 03

DEPUTY CLERK⸻

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WAINY U. RICHARDSON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **No. 4:15-CV-0879-BL** |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **Acting Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 42 U. S. C. § 405(g), Plaintiff seeks judicial review of a decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* Compl. (doc. 1). The Commissioner has filed an answer, *see* Def.'s Answer (doc. 10), and a certified copy of the transcript of the administrative proceedings, *see* SSA Admin. R. [hereinafter "R."] (doc. 13), including the hearing before the Administrative Law Judge ("ALJ"). The parties have briefed the issues. *See* Pl.'s Appeal (doc. 17); Def.'s Br. (doc. 18); Pl.'s Reply (doc. 19). Based upon the parties' Consent to Proceed Before a United States Magistrate Judge (doc. 12), the United States District Judge reassigned the case to the undersigned pursuant to 28 U.S.C. § 636(c). *See* Order (doc. 14). After considering the pleadings, briefs, administrative record, and applicable law, the Court reverses the Commissioner's decision and remands this case for further administrative proceedings consistent with this order.

## I.    BACKGROUND

Plaintiff initially claimed disability due to neck, back, and shoulder problems. R. 142. She filed an application for DIB on July 17, 2012, alleging disability beginning June 22, 2010. R. 106,

138. At that time, the Social Security Field Office noted that Plaintiff "seemed to be in pain" but it observed no difficulties with sitting, standing, or walking. R. 139. Her date of last insured ("DLI") is December 31, 2015. R. 138. Therefore, the relevant time period for her application and the Court's review commenced June 22, 2010, and expired December 31, 2015.

The Commissioner denied the application initially and on reconsideration. R. 45-46. On January 2, 2014, Administrative Law Judge ("ALJ") Carol Bowen held a hearing on Plaintiff's claim. *See* R. 26-43. On April 30, 2014, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing work that exists in significant numbers in the national economy. R. 12-20. Applying the sequential, five-step analysis set out in 20 C.F.R. § 404.1520(a)(4), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. R. 14. The ALJ next determined that Plaintiff suffered from back and shoulder impairments, and commencing in 2013, she also suffered from "chronic pain syndrome, major depressive disorder, depressive disorder due to other medical conditions, and generalized anxiety disorder." *Id.* Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[1] R. 14-16.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[2] to perform a limited range of light work as defined in 20 C.F.R. § 404.1567(b).[3] R. 16-18. Based upon

---

[1] The relevant regulation explains the purpose and use of the listings of impairments. *See* 20 C.F.R. § 404.1525.

[2] A claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. *Id.* § 404.1546(c). But that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* § 404.1545(a)(3).

[3] The regulations address physical exertion requirements and explain:
> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or

the RFC determination and testimony from a vocational expert ("VE") about the exertional demands and skill requirements of Plaintiff's prior job, the ALJ concluded that Plaintiff could not perform her past relevant work as a letter carrier, but could perform jobs that exist in significant numbers in the national economy. R. 18-19. The VE identified three sedentary jobs that would be available for a hypothetical person with an RFC consistent with that assessed for Plaintiff. *See* R. 39-40. At Step 5 of the evaluative sequence, the ALJ thus found that Plaintiff was not disabled within the meaning of the Social Security Act between June 22, 2010, and the date of the ALJ's decision. R. 19.

On July 7, 2015, the Appeals Council found no reason to review the ALJ decision and thus denied Plaintiff's request for review. R. 4. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on November 19, 2015. *See* Compl. She presents four issues for review, including whether the ALJ properly considered opinions of her treating physician when determining her Physical RFC and whether the ALJ included all vocationally significant limitations when determining her Mental RFC. *See* Pl.'s Appeal at 1-2, 4-17.

## II.    MEDICAL RECORD

A summary of the relevant medical record is helpful before setting out the legal standards

---

> standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

and analyzing the issues. Plaintiff asserts error in the consideration given to opinions of her treating physician, Byron E. Strain, M.D.

Dr. Strain, a Board Certified Physician in Physical Medicine and Rehabilitation, began treating Plaintiff in September 2005 after she was involved in a low-speed automobile accident while working. *See* R. 195. At that time, Plaintiff had documented back and shoulder impairments, an antalgic gait, and difficulty with toe walking, but she was able to heel walk. *See* R. 196. While working in November 2005, Plaintiff re-injured her back and shoulders "when she lifted a heavy bucket of mail." R. 252.

Although Dr. Strain treated Plaintiff every three months for eight years, R. 295, a gap in the record exists until January 7, 2009, when he conducted a three-hour functional capacity evaluation ("FCE") secondary to the November 2005 injury, *see* R. 252. At that time, Plaintiff could sit in one position for less than five minutes, walk on a treadmill for less than four minutes, stand in one position for less than three minutes, and bend forward at the waist for less than a minute. R. 252-53. She could not perform any squat, torso, or box lifts. R. 253. Her arm and reach lifts were limited to five pounds. *Id.* Dr. Strain found that Plaintiff provided "consistent effort in all areas of the evaluation," all observed subjective criteria were "consistent with valid effort," and the results of the objective tests "showed consistent effort in all tests." R. 254. Based upon this testing, Dr. Strain found that Plaintiff was "functioning in the sedentary work level" although her job required work at a medium level. *Id.*

Plaintiff returned to Dr. Strain the next month with complaints of back, neck, and hand pain. R. 216. The doctor noted that she had "severe interference with all activities of daily living" ("ADL") and her "FCE places [her] in a sedentary position," but she was "able to continue working

4

with her current restrictions."[4] *Id.* Throughout the remainder of 2009 and through June 2010, prior to Plaintiff's alleged onset date of disability, June 22, 2010, Dr. Strain consistently noted back, neck, and hand pain ranging from six to eight on a ten-point scale; severe interference with ADL; and only partial relief from medications, but Plaintiff retained the ability to continue working with restrictions. R. 208-15.

Dr. Strain conducted a second FCE on July 15, 2009, and another in December 2009, both of which show results, findings, and conclusions that were essentially unchanged from the original evaluation. *Compare* R. 245-51 *with* R. 252-56. He conducted a fourth FCE on July 7, 2010. *See* R. 239-42. Like the prior ones, it shows Plaintiff "functioning in the sedentary work level." R. 242. Plaintiff could sit in one position for less than three minutes, walk on a treadmill for about three minutes, stand in one position for almost two minutes, and bend forward at the waist for two minutes. R. 239-40. She was still unable to perform any box lifts. R. 240. She still provided consistent effort as supported by subjective and objective observations. *Id.*

On July 12, 2010, a physical therapist at Classic Rehabilitation, Inc. completed a Discharge Evaluation that notes an initial visit of June 30, 2010, upon referral from Dr. Strain; a back sprain/strain diagnosis; and past medical history regarding treatment for a May 2005 work-related injury. R. 243-44. Plaintiff presented multiple observed postural deviations. R. 243. According to the written evaluation, objective findings were consistent with the diagnosis. *Id.* Several problems supported medically necessary skilled therapy services: (1) decreased strength in upper and lower extremities in all planes and cervical spine; (2) decreased range of motion ("ROM") in lumbar and cervical spine in addition to the upper and lower extremities in all planes; (3) pain that limits

---

[4]Plaintiff testified that she worked as "lobby director" while she was on restricted work duty. R. 29.

function mobility including dressing skills; and (4) posture. *Id.* After Plaintiff completed her two authorized visits she was discharged with a home exercise plan. R. 244.

In both September and December 2010, Plaintiff reported to Dr. Strain that she was not working because her employer could not accommodate her restrictions. R. 203, 206. Other than those notations, the evaluations and one in October 2010 remained materially similar to evaluations that occurred before her alleged date of onset. *Compare* R. 203, 205-06 *with* R. 208-15. Plaintiff next saw Dr. Strain in March 2011 and the record shows no significant change. R. 200.

Upon referral from Dr. Strain, Plaintiff had MRIs of her shoulders and the lumbar and cervical regions of her spine on June 22, 2011. R. 257-60. The scan of the cervical region shows multi-level disc bulges. R. 257. The scan of the lumbar region shows a broad-based disc protrusion and a disc bulge contacting a nerve root. R. 260. Both shoulder scans show mild "tendinosis without defined tears" and mild bursitis with inflammation that clinically correlated with impingement syndrome. R. 261-64. Her left shoulder scan also reveals nonspecific swelling, mild joint effusion, and small axillary lymph nodes. R. 262. Her right shoulder scan additionally reveals nonspecific adenopathy of left axilla and nonspecific inflammation of deltoid muscles that could represent mysositis or contusion. R. 263-64.

As directed by the Office of Workers' Comp Programs, Plaintiff obtained a second opinion examination from Farooq L. Selod, M.D., on July 25, 2011. R. 233. Dr. Selod diagnosed lumbar strain, cervical strain, and bilateral shoulder pain, but found no objective findings to support an inability to return to work. R. 236-37. He reviewed a negative "upper extremity EMG" from March 2006 and noted that an "MRI of the left shoulder on 04/04/08 is not significant." R. 236. He noted that although Plaintiff complained of pain around her shoulders, "her range of motion was forward

6

flexion 110, abduction 90, adduction 30, internal rotation 80, external rotation 80, extension 45

degrees bilaterally, complaining of 9+ pain on range of motion." *Id.* With respect to her lower back

examination, he made the following notation:

> There was tenderness with pain L4 to S1.  Forward flexion 55, extension 10, bends
> 15 with 2+ pain on motion.  Her sitting SLR [(straight leg raise)] was 80 degrees.
> Her supine, however, was 40 degrees and she was complaining of pain.  There was
> a make and break pattern on the SLR, in other words she had osmotic movement
> when I lifted beyond 40 degrees.  Also it should be mentioned that when I asked her
> to take her shoes off while she was lying down on the exam table, she bent over and
> untied her laces and took her shoes as well as socks off which gave her more than 90
> degrees of flexion while she was in a sitting position.  When examining her lower
> extremities for strength, I was not able to get any valid test because she made a make
> and break pattern of the extensors of the ankle as well as the toes.  However, it
> should be mentioned she was able to stand on her tiptoes and heels and Trendelen-
> burg test was negative.  There was no asymmetry in deep tendon reflexes on evalua-
> tion.  Sensory was intact bilaterally.

*Id.* After noting that "her symptoms are extremely subjective in nature" and that his review of the

EMG and 2008 MRI showed "no evidence of any nerve damage," he concluded that she could return

to regular work as a mail carrier. R. 236-37.  He completed a Work Capacity Evaluation that merely

indicates that Plaintiff was capable of performing her usual job.  R. 238.  Although that evaluation

form provided space to indicate whether Plaintiff had any limitation in various activities, i.e., sitting,

walking, standing, reaching, lifting, etc., Dr. Selod noted no limitations.  *Id.*

By letter dated August 12, 2011, the Office of Workers' Comp Programs requested that Dr.

Strain review Dr. Selod's report and state whether he agreed that Plaintiff "is capable of working 8

hours per day as a letter carrier with the United States Postal Service with no restrictions." R. 233.

While the letter provided a space for Dr. Strain to sign and date, if he agreed with Dr. Selod, he

neither signed nor dated it. *See id.*  The letter otherwise directed Dr. Strain to "indicate the specific

reasons for [his] disagreement via a narrative addendum report," which "explain[s] the exact nature

and reasons for any dissenting opinions [he] may have" and bases any "counter recommendations on pertinent objective findings, diagnostic test results, or firm medical rationale." *See id.*

Within a week of that letter, Dr. Strain signed an evaluation that is consistent with his prior evaluations which found that Plaintiff "performs at a sedentary level" and that he had "released her to work with the appropriate restrictions." R. 231. The next month and in December 2011, Plaintiff reported to Dr. Strain that her employer had no position for her due to her restrictions. R. 227, 229. Other than noting those reports, the September and December 2011 evaluations do not differ materially from prior ones. *Compare id. with* R. 203, 205-06, 208-15.

Dr. Strain consistently made the same evaluations in March, June, and July 2012. R. 219, 221-23, 225. Plaintiff discussed disability retirement with Dr. Strain in June 2012. R. 221. He noted that he had released her to work with restrictions but because no jobs were available for her, he was "recommending disability retirement." *Id.* Plaintiff returned the next month with "her disability retirement paperwork." R. 219.

In a Narrative Report dated August 8, 2012, Dr. Strain set out Plaintiff's medical history regarding her November 2005 work-related injury. R. 217-18. He noted back and shoulder impairments "as documented by MRIs." R. 217. He found that Plaintiff had "reached maximum medical improvement" and recommended "disability retirement" for her due to her restrictions and "permanent physical impairment." R. 217-18. Given "the nature of her chronic residual spine and shoulder pain," he found that the most Plaintiff "could be expected to lift [was] 5-10 pounds on a repetitive basis" and she would be unable to climb, kneel, bend, stoop, twist, push, pull, or reach above shoulder level. R. 217. He recommended that she be restricted from "any kind of heavy lifting" and that she "not return to an occupation physical in nature, which requires arduous exertion of repeated

bending at the waist, prolonged standing, carrying, and lifting especially [loads] greater than 5-10 pounds." R. 218.

In late August 2012, Plaintiff completed a two-day vocational assessment at Goodwill Evaluation Services ("Goodwill"). R. 276-84. Goodwill noted that, following her 2005 work-related injury, Plaintiff returned to work under restrictions and "remained with this work activity until June 2010 when the post office no longer had light duty work for her, and she has not returned since then." R. 276. It further noted evaluations that "all essentially showed she was functioning at the sedentary physical demand level." *Id.* Additionally, it noted a January 6, 2012 work capacity evaluation which indicates that Plaintiff (1) could sit for fifteen minutes at a time up to six to eight hours a day and stand/walk for fifteen minutes at a time up to two hours a day; (2) would need frequent opportunities to change positions; (3) was limited to "lifting 0 lbs. frequently and 5 lbs. occasionally" with no lifting "below 20 inches off the ground;" (4) had limited ability to lift overhead; and (5) could drive fifteen to thirty minutes at a time up to one hour a day. R. 277.

Based on her response on a self-reporting form, Goodwill found that Plaintiff was "somewhat to not familiar with mouse usage and Windows Operating system." R. 278. Aptitude testing revealed that Plaintiff was (1) below average in general learning, verbal, spatial, and form perception; (2) well below average in numerical; (3) low average in clerical perception; and (4) low in motor coordination. R. 279. Goodwill listed numerous vocational limitations and needs, including spine and shoulder impairments, likely anxiety and depression issues, limited work tolerance due to increasing pain, slow and limited dexterity, and low academic abilities. R. 283. Goodwill found no reason to believe that Plaintiff "could manage even a part time sedentary job at this time" given observed functional difficulties. *Id.* It recommended that Plaintiff (1) apply for medical retirement

9

and social security benefits, (2) obtain psychotherapeutic counseling services, (3) explore support groups, (4) volunteer activity as tolerated for therapeutic purposes, and (5) consider some very simple part time work activity should her tolerance and capacities improve at a later time. R. 284.

After reviewing all evidence in the file, Tina Ward, M.D., noted back and shoulder impairments in a Physical Residual Functional Capacity Assessment ("PRFCA") dated September 6, 2012. R. 285-92. Dr. Ward recorded the following exertional limitations: (1) occasionally lift/carry ten pounds, less than ten pounds frequently; (2) stand/walk for about six hours in a workday; (3) sit with normal breaks for about six hours in a workday; and (4) push or pull as shown for lift/carry. R. 286. Dr. Ward, however, provided no explanation for how or why the evidence supported those conclusions. *See id.* According to Dr. Ward, Plaintiff also had postural limitations that precluded climbing ladders, ropes, and scaffolds, but permitted occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. R. 287. Plaintiff was also limited in reaching in all directions, including overhead, which was limited to occasionally bilaterally. R. 288. Dr. Ward noted that the medical file contains a medical source statement regarding Plaintiff's physical capacities but found no "medical source conclusions about the claimant's limitations or restrictions which are significantly different from [her] findings." R. 291. Dr. Ward considered the June 2011 MRIs; a July 23, 2012 physical examination; an August 8, 2012 note; Plaintiff's stated activities of daily living; and field office observations that Plaintiff appeared to be in pain but had no difficulty sitting, standing, or walking. R. 292.

As reflected in Dr. Strain's records, Plaintiff's condition remained unchanged from September 2012 through June 2013. *See* R. 309, 312, 315, 318. Upon unspecified referral, Plaintiff visited Charles Willis, M.D., and Adam D. Coffey, Ph.D., in January 2013 for a requested upgrade

of accepted conditions to include chronic pain syndrome. *See* R. 337-39. These doctors noted Plaintiff's November 2005 injury and her return "to 'light duty' work, yet [she] found this level of activity eventually unbearable, leading her to stop working June 22, 2010." R. 334, 337. At that consultation, she appeared "unable to work in her current state" and she "reported moments of throbbing and burning, having a few of them during [the] short meeting." *Id.* Clinical testing revealed moderate depression and moderate to severe anxiety. R. 335. Dr. Coffey diagnosed a major depressive disorder. R. 335-36. The doctors opined that Plaintiff exhibited symptoms of chronic pain syndrome and she "should receive authorization for participation in a low level of individual psychotherapy" for at least eight weeks on a weekly basis. R. 339.

On June 24, 2013, Dr. Strain completed a Physical Medical Source Statement. *See* R. 295-98. He described Plaintiff's symptoms as decreased range of motion and endurance, muscle spasms, and pain limited strength. R. 295. He identified clinical findings and objective signs related to Plaintiff: "MRI - HNP;"[5] limited range of motion in spine; positive for impingement in both shoulders; and "MRI RTC tendinitis and down sloping acromion." *Id.* He also identified anxiety, depression, and psychological factors that affected Plaintiff's physical condition. R. 296.

Dr. Strain estimated that, in a competitive work situation, Plaintiff could (1) sit five minutes and stand five minutes before needing to alternate positions; (2) stand/walk less than two hours in a work day; and (3) sit about four hours in a work day. *Id.* Plaintiff would need a job that permits alternating between sitting, standing, and walking. *Id.* Every five minutes, she would also need to walk for a minute. *Id.* Every thirty minutes, she would need an unscheduled break. *Id.* Pain, adverse effects from medication, and muscle spasms created the need for breaks. *Id.* Plaintiff's physi-

---

[5]In the medical field, "HNP" typically stands for herniated nucleus pulposus.

cal impairments precluded twisting, stooping, crouching, climbing ladders, and lifting or carrying twenty pounds or more. R. 297. She could rarely climb stairs and occasionally lift or carry ten pounds or less. *Id.* She also had significant limitations with reaching, handling, or fingering. *Id.* A quarter of the time, her symptoms would "likely be severe enough to interfere with attention and concentration needed to perform even simple tasks." R. 298. She would likely be absent from work more than four days a month. *Id.*

On June 28, 2013, Plaintiff again visited Dr. Willis. R. 332-33. Physical examination revealed muscle spasms, tenderness, swelling, deformity, and decreased range of motion in her cervical and lumbar regions. R. 332. Straight leg raising was ninety degrees bilaterally. *Id.* She had normal hand grip, gait within normal limits, and normal toe and heel walking, but decreased sensation and motor deficit to the left upper and lower extremities. R. 333. The stated assessment was depressive disorder, cervical and lumbar disc displacement, and cervical and lumbar radiculopathy. *Id.*

Except for "an improved mood" in October 2013, Dr. Willis noted no significant changes in Plaintiff's condition following her visits in August, September, and October 2013. *See* R. 329-31. Similarly, Dr. Strain's evaluations in September and December 2013 remained consistent with his prior evaluations. *See* R. 300, 303, 306.

Plaintiff began seeing Shahzad Allawala, M.D. for depression and anxiety in November 2013. *See* R. 323. Among other things, the doctor noted signs of anxiety and moderate depression, a "short attention span," and "easily distracted." R. 324. Nevertheless, Plaintiff exhibited intact language skills, short and long term memory, and abilities "to abstract and do arithmetic calculations." *Id.* Her "[v]ocabulary and fund of knowledge indicate cognitive functioning in the normal range." *Id.* She exhibited logical thinking and appropriate thought content. *Id.* Dr. Allawala diag-

nosed a major depressive disorder, a generalized anxiety disorder, and a depressive disorder due to another medical condition and prescribed medication. R. 324-25. The next month, Dr. Allawala noted that Plaintiff had "partially improved" and had good compliance with medication, but had the same diagnoses. R. 326. The doctor increased one medication and added another. *See* R. 326-27.

## III.   LEGAL STANDARD

In general,[6] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)). To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently work-ing; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but

---

[6]The Act provides an alternate definition of disability for blind individuals who are fifty-five years of age or older. *See* 42 U.S.C. § 423(d)(1)(B). This provision is inapplicable on the current facts.

the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, No. 15-30449, 2016 WL 1551685, at *3 (5th Cir. Apr. 11, 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

## IV.   ANALYSIS

This appeal raises the following issues: (1) whether the ALJ properly considered the opinions of Dr. Strain when determining Plaintiff's Physical RFC; (2) whether the ALJ included all of her vocationally significant limitations when determining her Mental RFC; (3) whether the ALJ considered the effect of all of her impairments when assessing her credibility; and (4) whether the

ALJ properly relied on the testimony of the vocational expert to establish the existence of work that she could perform. *See* Pl.'s Appeal at 1-2, 4-17.

## A. Physical RFC Determination and Weight Given to Medical Evidence

Plaintiff contends that the ALJ failed to give proper consideration to opinions of her treating physician, Dr. Strain, when determining her physical RFC.

When considering whether a claimant is disabled, the Commissioner considers the medical evidence available, including medical opinions.[7] *See* 20 C.F.R. § 404.1527(b). Medical opinions may come from treating sources (for example primary care physicians), non-treating sources (physicians who perform a single examination of the claimant), or non-examining sources (a physician who reviews only the claimant's medical record). *See generally* 20 C.F.R. § 404.1502. The Fifth Circuit has "long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Nevertheless, even opinions from a treating source are "far from conclusive," because ALJs have "the sole responsibility for determining the claimant's disability status." *Id.*; *accord Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

"After identifying relevant medical opinions of treating physicians, ALJs must determine whether any such opinion is entitled to controlling weight." *Bentley v. Colvin*, No. 13-CV-4238-P, 2015 WL 5836029, at *7 (N.D. Tex. Sept. 30, 2015) (citing appropriate regulations). When

---

[7]As explained to claimants: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). This regulation, however, reserves some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulation. *Id.* § 404.1527(d).

identifying and considering relevant opinions, ALJs "must remember" that some medical records, such as medical source statements provided by a treating source, "may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one." Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5P, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).

The regulations provide a six-factor detailed analysis to follow unless the ALJ gives "a treating source's opinion controlling weight." 20 C.F.R. § 404.1527(c)(1)-(6).[8] "When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with' other substantial evidence." *Wilder v. Colvin*, No. 13-CV-3014-P, 2014 WL 2931884, at *3 (N.D. Tex. June 30, 2014) (quoting *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)); *accord* 20 C.F.R. § 404.1527(c)(2). Furthermore, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the regulations]." *Newton*, 209 F.3d at 453.

In addition, under 20 C.F.R. § 404.1520b(c)(1), "the ALJ may re-contact a treating physician or other medical source if there is insufficient evidence to determine whether the claimant is dis-

---

[8]These factors are: (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of the treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c).

abled." *Perry v. Colvin*, No. 13-CV-2252-P, 2015 WL 5458925, at *7 (N.D. Tex. Sept. 17, 2015);

*accord Jones v. Colvin*, No. 4:13-CV-818-A, 2015 WL 631670, at *7 (N.D. Tex. Feb. 13, 2015)

(accepting recommendation of Mag. J. which recognized that, effective March 26, 2012, this new

regulation replaced the former mandatory requirement of § 404.1512(e) applied in *Newton*).[9]

Further, "if after weighing the evidence [the ALJ] cannot reach a conclusion about whether [the

claimant is] disabled," § 404.1520b(c) provides "various options, including re-contacting a treating

physician or other medical source, to resolve an inconsistency or insufficiency of evidence." *Bentley*,

2015 WL 5836029, at *8.

ALJs who find a treating source opinion not entitled to controlling weight must consider the

six factors of § 404.1527(c) to properly assess the weight to give such opinions. *Newton*, 209 F.3d

at 456. However, "*Newton* requires only that the ALJ 'consider' each of the [§ 404.1527(c)] factors

and articulate good reasons for its decision to accept or reject the treating physician's opinion. The

[ALJ] need not *recite* each factor as a litany in every case." *Jeffcoat v. Astrue*, No. 4:08-CV-672-A,

2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010) (emphasis added); *accord Emery v. Astrue*, No.

7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept. 17, 2008); *Burk v. Astrue*, No. 3:07-

CV-899-B, 2008 WL 4899232, at *4 (N.D. Tex. Nov. 12, 2008) (accepting recommendation of Mag.

J.). *Newton*, furthermore, does not require the detailed analysis when "there is competing first-hand

medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-

founded than another." 209 F.3d at 458. Likewise, the detailed analysis under *Newton* is not neces-

---

[9]This regulation was in effect when the ALJ issued her decision on April 30, 2014. Prior to the effective date of § 404.1520b, the ALJ would have been obliged under the mandatory provision of § 404.1512(e) to "seek clarification or additional evidence from the treating physician" if the ALJ determined "that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight, absent other medical opinion evidence based on personal examination or treatment of the claimant." *See Newton*, 209 F.3d at 453.

sary when the ALJ has weighed the treating physician's opinion against opinions of other treating or examining physicians who "have specific medical bases for a contrary opinion." *Id.*

The elimination of the detailed-analysis requirement in some circumstances prompted a later Fifth Circuit panel to state that "*Newton* does not apply" in those situations and that *Newton* "limited its holding to cases where the ALJ rejects the sole relevant medical opinion before it." *See Qualls v. Astrue*, 339 F. App'x 461, 466 & n.2 (5th Cir. 2009) (per curiam). While noting that limitation, *Qualls* did not change the law as set out in *Newton*. Consequently, when the record contains competing first-hand medical evidence, the ALJ is not required to analyze the criteria set forth in § 404.1527(c) before declining to give great weight to a treating physician's opinion. *Newton*, 209 F.3d at 458; *Lopez v. Astrue*, 854 F. Supp. 2d 415, 423 (N.D. Tex. 2012); *Nicaragua v. Colvin*, No. 3:12-CV-2109-G-BN, 2013 WL 4647698, at *4 (N.D. Tex. Aug. 29, 2013). Similarly, the detailed analysis is unnecessary when the ALJ has weighed the treating physician's opinions against other treating or examining physicians in the circumstances set out in *Newton*.

The ALJ, as fact-finder, "has the sole responsibility for weighing evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). ALJs have considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton*, 209 F.3d at 455-56. Additionally, for good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

18

Both parties appear to treat all opinions of Dr. Strain as medical opinions. However, to be clear, opinions that (1) conclude that a claimant is disabled or unable to work due to impairments or (2) assess a claimant's RFC "are not medical opinions" under the regulations. *See* 20 C.F.R. § 404.1527(d). Such opinions are specifically excepted from the definition of "medical opinions" because the opinions address "issues reserved to the Commissioner," *id.*, and "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or even special significance," *Dobbins v. Colvin*, No. 6:14-CV-055-BL, 2016 WL 1179020, at *3 (N.D. Tex. Feb. 25, 2016) (recommendation of Mag. J.), *adopted by* 2016 WL 1248911 (N.D. Tex. Mar. 25, 2016). ALJs do not err when they fail to credit legal conclusions on issues reserved to the Commissioner. *Tucker v. Astrue*, 337 F. App'x 392, 396-97 (5th Cir. 2009) (per curiam).

When Dr. Strain notes in his records that Plaintiff is working at a sedentary level, he is noting a conclusion that, of itself, is not a medical opinion. *See* Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5P, 1996 WL 374183, at *5 (S.S.A. July 2, 1996) (recognizing that use of phrases such as "sedentary work" to reflect "judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability"). While such a conclusion is not entitled to any special significance, his medical opinions, i.e., the claimant's symptoms, diagnosis, prognosis, physical and mental restrictions, and other medical judgments as to the nature and severity of the claimant's impairments, *see* 20 C.F.R. § 404.1527(a)(2); SSR 96-5P, 1996 WL 374183, at *2, that support the legal conclusion may be entitled to special significance.

In this case, there is no dispute that Plaintiff suffered from back and shoulder impairments

in addition to various mental impairments. The dispute arises from what effect those impairments had on Plaintiff's functional ability to engage in any substantial gainful activity. Based on his evaluations, Dr. Strain concluded that Plaintiff was functioning at a sedentary level, *see, e.g.*, R. 217-18 (narrative report of August 8, 2012), 239 (FCE of July 7, 2010), but Dr. Selod concluded that she could return to her prior medium work based on his single consultative examination in July 2011, R. 235. Neither of those non-medical conclusions are entitled to any special significance and the ALJ gave them none.

While it would be preferable for the ALJ to identify the non-medical conclusions for what they are, she did consider them. Recognizing the disparity between the two conclusions, she observed that, given the disparity "and the one year lapse in time between the two evaluations, it is evident that the claimant's physical abilities fit somewhere between the two extremes." R. 17. That observation, however, is not so evident based solely upon the lapse of time and the disparity between the conclusions. Although Dr. Strain had completed his narrative report a year after Dr. Selod's consultative report, Dr. Strain had consistently concluded that Plaintiff was functioning at the sedentary work level since at least January 2009. *Compare* R. 217-18 (narrative report) *with* R. 252-54 (FCE of Jan. 2009). The one year difference provides no basis to conclude that Plaintiff was functioning at a level between the two non-medical conclusions. Furthermore, that a consultative examiner reached a conclusion different from a treating source does not mean that the patient's functioning level lies between the two conclusions.

The ALJ asserts that the June 2011 MRIs, which reveal a greater level of impairment than that observed by Dr. Selod, bolster her observation. R. 17. While those MRIs may provide a sound basis for rejecting or discounting opinions and conclusions of Dr. Selod because he did not mention

the MRIs and specifically relied on an MRI performed in 2008, *see* R. 235, Dr. Strain did consider

them when he made his August 2012 narrative report, *see* R. 217.   Moreover, Dr. Strain referred

Plaintiff for the MRIs in 2011, *see* R. 257, 259, 261, 263, and presumably knew their results well

before his narrative report.   He certainly knew their results when he restated his sedentary work

conclusion in the latter part of 2012 through June 2013.   *See* R. 309, 312, 315, 318.   The ALJ

provides no reason for viewing the 2011 MRIs as a basis to discount any medical opinion of Dr.

Strain.   In fact, the ALJ appears to rely on those MRIs only to reject the opinions and conclusion of

Dr. Selod.   *See* R. 17.

The ALJ also discounts the assessment of Dr. Strain on grounds that, after his initial assess-

ment that Plaintiff was restricted to sedentary work, he consistently stated that assessment while only

specifically noting that Plaintiff was to avoid heavy lifting; minimize tasks requiring bending at the

waist, prolonged standing, or carrying and lifting loads greater than ten pounds.   *Id.* (citing August

2012 report).   Dr. Strain indeed made the referenced restrictions in his August 2012 narrative report,

but he also limited repetitive lifting to five to ten pounds and stated that Plaintiff would be unable

"to do any climbing, kneeling, bending, stooping, twisting, pushing, pulling, or reaching above the

shoulder level."   R. 217.   The ALJ does not mention these medical opinions.

While somewhat ambiguous, Dr. Strain's notation that Plaintiff was limited to repetitively

lifting no more than ten pounds appears inconsistent with the regulatory definition of sedentary work.

The applicable regulation explains:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally
> lifting or carrying articles like docket files, ledgers, and small tools.   Although a
> sedentary job is defined as one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job duties.   Jobs are sedentary if
> walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). To determine whether an individual has the ability to perform the full

range of sedentary work from an exertional standpoint, Program Policy Statement (PPS) 101 elabor-

ates:

> "Occasionally" means occurring from very little up to one-third of the time. Since
> being on one's feet is required "occasionally" at the sedentary level of exertion,
> periods of standing or walking should generally total no more than about 2 hours of
> an 8-hour workday, and sitting should generally total approximately 6 hours of an
> 8-hour workday.

Titles II & XVI: Determining Capability to do Other Work – The Medical-Vocational Rules of

Appendix 2, SSR 83–10 (PPS–101), 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983). A prohibition on

any heavy lifting fits within the regulatory definition for sedentary work, but repetitive lifting of five

to ten pounds on more than an occasional basis appears inconsistent with that definition. As the

Social Security Administration has pointed out, medical sources may not be aware of applicable

definitions of terms such as "sedentary activity" even when the source uses such terms in their

records and opinions. *See* Titles II & XVI:  Med. Source Ops. on Issues Reserved to the Comm'r,

SSR 96-5P, 1996 WL 374183, at *5 (S.S.A. July 2, 1996). There should be no assumption that a

medical source uses such terms with an understanding of the social security definition. *See id.*

   In any event, Dr. Strain's June 24, 2013 Medical Source Statement clarifies any ambiguity

in the lifting limitation. Dr. Strain therein opined that Plaintiff would only be able to occasionally

lift and carry ten pounds or less. R. 297. He further opined that, in a competitive work situation,

Plaintiff's impairments would preclude twisting, stooping, bending, crouching, squatting, climbing

ladders, reaching overhead, and lifting twenty pounds or more, but she would be able to climb stairs

rarely. *Id.* Dr. Sprain also identified significant limitations on Plaintiff's ability to sit (no more than

four hours) and stand (less than two hours) and her need to alternate between sitting and standing

and a need for frequent unscheduled breaks. R. 296.

The ALJ considered Dr. Strain's June 24, 2013 medical source statement in which he detailed Plaintiff's specific limitations. R. 18. Although the ALJ accorded these opinions "some weight," she was unconvinced that Plaintiff was as limited as Dr. Strain opined. *Id.* The ALJ noted that the record does not show that "claimant has considerable deficits in her ability to stand and walk" and lacks "findings such as antalgic gait, use of an assistive device, or significant abnormalities or impaired range of motion in the lower extremities." *Id.* Further noting that light work allows for up to six hours of standing and walking, the ALJ found that Plaintiff "is able to stand and/or stretch at her workstation for two minutes with every 30 minutes of sitting," based on her "report that sitting for prolonged periods causes pain." *Id.* She also provided for a hazard exposure within her assessed RFC based on Plaintiff's report that her medications cause drowsiness. *Id.*

The ALJ also considered the September 2012 opinions of Dr. Ward, a non-examining state agency medical consultant. *Id.* The ALJ noted that Dr. Ward had determined that Plaintiff "could perform the exertional demands of light work, with lifting restricted to 10 pounds, occasional postural activities and occasional overhead reaching." *Id.* (citing Ex. 4F (R. 285-92)). The ALJ gave these opinions great weight and found them "consistent with the longitudinal record as a whole." *Id.* While the ALJ's summary of these opinions slightly misstates the doctor's noted postural limitations by not stating Plaintiff's inability to climb ladders; ropes; or scaffolds, *compare* R. 18 *with* R. 287, the ALJ ultimately assesses an RFC that precludes climbing and adds another postural limitation – no crawling, *see* R. 16.

The ALJ found that Plaintiff had the RFC for a limited range of light work. R. 16-18. She thus rejected both the conclusion of Dr. Selod that Plaintiff could perform medium work and the

conclusion of Dr. Strain that Plaintiff was limited to sedentary work. The ALJ properly rejected these conclusions, but the pertinent question is whether the ALJ properly rejected or discounted the medical opinions of Dr. Strain underlying his sedentary work assessment. Despite the presence of the non-medical conclusion of Dr. Strain, the record clearly reflects that the ALJ rejected more than the ultimate conclusion that Plaintiff was limited to performing sedentary work. Not only did the ALJ reject that non-medical conclusion on an issue reserved to the Commissioner, but she rejected medical opinions of Dr. Strain in favor of opinions of a non-examining source. *See* R. 18.

Although light work involves lifting up to twenty pounds, *see* 20 C.F.R. § 404.1567(b), the ALJ found that Plaintiff was limited to lifting or carrying ten pounds occasionally and less than ten pounds frequently. R. 16. The ALJ further found that, while Plaintiff could sit for about six hours and stand for a similar time period, she would need to stand or stretch for two minutes every half hour. *Id.* The ALJ also found that Plaintiff lacked the capacity to reach overhead, climb, or crawl. *Id.* In addition, the ALJ imposed an environmental restriction in that Plaintiff should avoid working "at unprotected heights or with hazardous moving machinery" based on her testimony that her medications made her drowsy. R. 16, 18. Based on Plaintiff's mental impairments, the ALJ found that she lacked the ability to maintain attention and concentration to complete complex tasks on a regular and continuing basis. R. 16.

The ALJ's RFC assessment precisely parallels the exertional limitations found by Dr. Ward, except that the ALJ also includes an additional postural limitation (no crawling) and a sit-stand option that would permit Plaintiff to stand at the work station for two minutes every half hour. *Compare id. with* R. 286. It is apparent from the ALJ decision that she rejected the conclusion of

Dr. Selod[10] and gave some weight to medical opinions of Dr. Strain, but gave greater weight to opinions of Dr. Ward, a non-examining source. Based on her RFC assessment, it is apparent that the ALJ accepted the sitting, standing, and lifting limitations found by Dr. Ward with some weight to Dr. Strain's opinion that Plaintiff would require an option to alternate between sitting and standing.

As a treating physician, Dr. Strain's medical opinions were entitled to controlling weight if well-supported as required by the regulations and not inconsistent with other substantial evidence. The ALJ did not directly address whether the opinions of Dr. Strain are well-supported, but – as previously mentioned – she did note a lack of evidence to support "considerable deficits" in Plaintiff's ability to stand and walk, as well as an absence of various findings, including findings of "significant abnormalities or impaired range of motion in the lower extremities." R. 18. In addition, not only did the ALJ find Dr. Strain's conclusion inconsistent with that of Dr. Selod, but she found Dr. Strain's opinions inconsistent with opinions of Dr. Ward. *See* R.17-18. At this point, there is no need to determine whether the ALJ erred in not giving the opinions of Dr. Strain controlling weight because even if the Court were to find no error in that respect, such finding merely clears the first hurdle. Once the ALJ makes that finding, she must make the detailed analysis required by 20 C.F.R. § 404.1527(c) unless there is reliable medical evidence from a treating or examining physician controverting the claimant's treating physician.

With respect to Plaintiff's physical impairments, Drs. Strain and Selod are the only treating or examining physicians mentioned by the ALJ. Because the ALJ rejected Dr. Selod's conclusion

---

[10]Dr. Selod made no specific medical opinion as to any limitation or restriction of Plaintiff's physical abilities; he simply found that she could return to her prior position that was a medium exertional level. *See* R. 235-37.

that Plaintiff could return to medium work and because Dr. Selod made no specific medical opinion as to any physical limitation, his report does not qualify as reliable medical evidence from an examining or treating source that controverts Plaintiff's treating physician.

Medical records from other examining sources not mentioned by the ALJ, i.e., Goodwill and Drs. Willis and Coffey, do not controvert any medical opinion of Dr. Strain, but Goodwill does note a January 2012 work capacity evaluation which indicates that Plaintiff could sit for six to eight hours a day but also had more severe lifting restrictions than those found by Dr. Strain. *See* R. 276-84, 329-39. Because the ALJ did not rely on this medical evidence and because the January 2012 evaluation has uncertain reliability given its absence from the administrative record, the Court finds that such medical records provide no basis to skip the detailed analysis required by § 404.1527(c).

For the reasons stated, the applicable regulation required the ALJ to analyze the opinions of Dr. Strain in the detailed manner set out in § 404.1527(c) and addressed in *Newton*. Furthermore, because Dr. Ward is a non-examining source, her opinions provide no basis to bypass the detailed six-factor analysis even though they controvert medical opinions of Dr. Strain.

In this case, the ALJ did not recite the six factors, although she does note in conclusory fashion that she had "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527" and various social security rulings. *See* R. 16. While the Commissioner characterizes this notation as showing that the ALJ applied the proper legal standard, *see* Def.'s Br. at 5, the decision must actually reflect consideration of the factors to comply with the legal standard. An ALJ cannot substitute a general, conclusory statement for consideration of the six factors.

The ALJ decision in this case reflects some consideration of the factors. She considered the examining and treatment relationship of Dr. Strain, including that he began treating her following

her 2005 work-related injury, but did not mention his board certification. R. 17. The ALJ also did not directly address factors three (support for opinions in the medical record) or four (consistency of the opinions with the record as a whole). However, the ALJ did consider (1) the greatly different non-medical conclusions of Dr. Strain and Dr. Selod with respect to Plaintiff's functional work level; (2) Dr. Strain's narrative report of August 8, 2012, that she viewed as lacking specific limitations to support his conclusion; (3) Dr. Strain's quarterly treatment and management of her pain with prescribed medications and a home exercise program; and (4) Dr. Strain's medical source statement dated June 24, 2013, which detailed Plaintiff's limitations, but the ALJ discounted because she viewed the record as not showing considerable deficits in Plaintiff's ability to stand and walk, as well as lacking medical findings regarding an abnormal gait, use of a cane or other assistive device, or significant abnormalities in the lower extremities. R.17-18. While these matters are relevant to the weight given to the medical opinions of Dr. Strain, the ALJ did not discuss support for his opinions found within the medical record or the consistency of his opinions with the record as a whole. The medical record reveals considerable deficits in Plaintiff's ability to stand and walk and an impaired range of motion the lower extremities. It thus appears that the ALJ procedurally erred by not more fully considering and weighing the opinions of Dr. Strain.

A procedural error does not require reversal and remand, however, unless the error affects the substantial rights of the claimant. *Snodgrass v. Colvin*, No. 11-CV-0219-P, 2013 WL 4223640, at *7 (N.D. Tex. Aug. 13, 2013) (citing *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012)). To warrant reversal, the error must "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988). "Remand is required only when there is a realistic possibility that the ALJ would have reached a different conclusion absent

the procedural error." *Ware v. Colvin*, No. 11-CV-1133-P, 2013 WL 3829472, at *4 (N.D. Tex. July 24, 2013) (citing *January v. Astrue*, 400 F. App'x 929, 933 (5th Cir. 2010) (per curiam)).

On the record before the Court, the failure to conduct the detailed analysis is not harmless error. Dr. Strain provided the only reliable medical opinions of Plaintiff's physical abilities from a treating or examining source. Rather than properly weigh and consider those opinions in accordance with the regulation and *Newton*, the ALJ accorded greater weight to medical opinions of Dr. Ward, a non-examining consultant. The ALJ accepted Dr. Ward's opinion that Plaintiff could lift ten pounds frequently, whereas Dr. Strain had opined that frequent lifting was limited to less than ten pounds. The doctors' opinions differed even more significantly with respect to Plaintiff's ability to sit and stand. Dr. Strain opined that Plaintiff was limited to sitting for about four hours and standing/walking for less than two hours, but Dr. Ward opined that she could perform those tasks for about six hours for sitting and standing/walking. Based on Dr. Strain's medical opinion that Plaintiff could not sit for more than four hours, Plaintiff did not possess the functional ability for a full-range of sedentary work. *See* Titles II & XVI: Determining Capability to do Other Work – The Medical-Vocational Rules of Appendix 2, SSR 83–10 (PPS–101), 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).

In making her RFC assessment, the ALJ rejected specific medical opinions of Dr. Strain. Rejecting medical opinions when there is no contrary opinion from a treating or examining source requires usurping the physicians' role. *See Newton v. Apfel*, 209 F.3d 448, 453-58 (5th Cir. 2000). "That is neither the role of the ALJ nor this Court. Neither the courts nor ALJs may rely on their own medical opinions as to the limitations presented by a claimant's impairments." *Howeth v. Colvin*, No. 12-CV-0979-P, 2014 WL 696471, at *11 (N.D. Tex. Feb. 24, 2014) (citing *Williams v.*

*Astrue*, 355 F. App'x 828, 832 (5th Cir. 2009) (per curiam decision reversing denial of benefits when the ALJ impermissibly relied on his own medical opinions as to limitations presented by the claimant's impairments). It is reversible error for ALJs to substitute their own medical opinions for those of a treating physician. *Evans v. Colvin*, No. 1:14-CV-202-BL, 2015 WL 9685552, at *3 (N.D. Tex. Dec. 8, 2015) (recommendation of Mag. J.), *adopted by* 2016 WL 112645 (N.D. Tex. Jan. 8, 2016).

Like *Newton*, "[t]his is not a case where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another." *See* 209 F.3d at 458. By entirely rejecting the conclusion of Dr. Selod and not relying on his report, the ALJ did not find his opinions well-founded. While the ALJ relied on medical opinions of Dr. Ward, such opinions do not constitute first-hand medical evidence, because they were formed on a second-hand basis from a review of then existing medical records. Like *Newton*, this is not "a case where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *See id.* Instead, like *Newton*, the ALJ in this case rejected medical opinions of a treating physician based only on opinions of a non-examining physician. *See id.* The ALJ did not reject the medical opinions of Dr. Strain due to any inconsistency with any medical opinion from a treating or examining source. By relying on the opinions of Dr. Ward to find certain limitations of Dr. Strain unsupported, the ALJ erred. Furthermore, to the extent the ALJ perceived a need for an additional or updated medical opinion, she took no steps to secure such opinion from any medical expert. The medical record before the ALJ provides no basis for rejecting the exertional limitations noted by Plaintiff's treating physician.

The Commissioner in this case carried her Step 5 burden through testimony of a VE who

29

identified sedentary jobs based upon the RFC assessed by the ALJ. Had the ALJ properly considered the medical opinions of Dr. Strain, there is a realistic possibility that her RFC assessment would have changed. The opinions of Dr. Strain support limitations greater than the RFC assessment. A change in the limitations within the questioning to the VE would cast doubt upon the existence of substantial evidence to support the ALJ's decision because to constitute substantial evidence to support a Step 5 finding of non-disability, testimony from a VE must include all limitations warranted by the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002); *Boyd v. Apfel*, 239 F.3d 698, 706 (5th Cir. 2001). Accordingly, to rely on the VE testimony to satisfy the Step 5 burden, the ALJ's hypothetical questioning would need to include all limitations warranted by the evidence.

The Court finds that the ALJ improperly considered and weighed the opinions of Dr. Strain. There is no good cause to discount the weight of those opinions relative to any other expert. The ALJ failed to perform the detailed analysis required by 20 C.F.R. § 404.1527. Had she conducted that analysis and properly considered and weighed the opinions of the treating physician there a realistic possibility that she would have altered her hypothetical to the VE to include greater limitations than assessed in the current RFC. Consequently, the procedural error casts doubt on the existence of substantial evidence to support the decision to deny benefits. Therefore, Plaintiff's substantial rights have been affected by the consideration and weight accorded to the opinions of the treating physicians by the ALJ. This procedural error is not harmless and warrants remand.

The Commissioner argues that the ALJ properly considered the opinions of Dr. Strain and accorded it some weight because an ALJ may appropriately discount medical opinions not supported by the evidence. Def.'s Br. at 6. Citing SSR 96-5p, the Commissioner further argues:

Requiring an ALJ's RFC finding or conclusion regarding a claimant's disability

status to be based on the opinion of a medical source "would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled."

*Id.* at 7.

The latter argument misconstrues SSR 96-5p by altering the language preceding the quoted language and by the alteration to the quotation. The Commissioner extracts the quoted material from a discussion regarding issues that "are not medical issues regarding the nature and severity of an individual's impairment(s)," but rather case-dispositive administrative findings that are reserved to the Commissioner. *See* Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5P, 1996 WL 374183, at *2 (S.S.A. July 2, 1996). After noting that some issues are reserved to the Commissioner for determination, SSR 96-5p goes on to state:

> Nevertheless, our rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. For treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

*Id.*[11] In making her argument, the Commissioner ignores or misstates three important aspects of the partially quoted sentence: (1) the sentence addresses treating source opinions, not opinions from all

---

[11]As discussed in a prior footnote, the rule requiring mandatory recontacting has been amended. Although the new rule would be applicable to this case, that amendment does not otherwise alter the language quoted from SSR 96-5p.

medical sources; (2) the opinions must be on an issue reserved to the Commissioner; and (3) giving controlling weight to an opinion differs from giving any weight to an opinion.

Despite the arguments of the Commissioner, an ALJ must properly consider opinions of treating physicians and cannot merely rely on contrary opinions of a non-examining physician. The ALJ did not properly consider the opinions of Dr. Strain. On the facts of this case, the Court does not find that error to be harmless. Accordingly, a remand for further consideration is warranted.

## B. Credibility Determination[12]

Plaintiff also argues that the ALJ improperly evaluated her credibility. Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." R. 18.

Courts accord "great deference" to an ALJ's credibility assessment when substantial evidence supports it. *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000); *accord Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990). While given circumstances may require ALJs to state specifically their reasons for finding subjective complaints not credible, they are not required to follow any formalistic rule or language. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). In this case, however, the ALJ merely relies on the questionable reasons stated for discounting the opinions of Dr. Strain.

---

[12]Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy" and in doing so, clarified "that subjective symptom evaluation is not an examination of an individual's character." Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2016 WL 1020935, at *1 (S.S.A. Mar. 16, 2016). When the ALJ issued her decision, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility." *See* Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, SSR 96-7P, 1996 WL 374186, at *7 (S.S.A. July 2, 1996).

The ALJ's failure to properly consider those opinions appears to have significantly affected the credibility determination. Under such circumstances, the Court does not find substantial evidence to support the ALJ's credibility finding. On remand, the ALJ should re-assess Plaintiff's credibility, unless the Commissioner instead applies SSR 16-3p, which became effective on March 16, 2016.

## C.  Other Issues

Plaintiff also urges the Court to reverse the Commissioner's decision because the ALJ failed to include all vocationally significant limitations in determining her Mental RFC and improperly relied on the VE's testimony. Because the Court has already found reversible error by the ALJ, there is no need to further determine whether the ALJ erred in determining Plaintiff's Mental RFC or in relying on VE testimony. Based on the improper consideration of medical opinions of Plaintiff's treating physician, the ALJ will necessarily need to re-access Plaintiff's physical RFC, formulate appropriate hypothetical questions for a VE based on the new assessment, and re-question a VE. When doing so, the ALJ should consider the impact that Plaintiff's severe mental impairments has on her RFC and functional abilities to perform work in the national economy.

## V.    CONCLUSION

For the foregoing reasons, the Court reverses the decision of the Commissioner and remands this case for further administrative proceedings consistent with this order.

**SO ORDERED** this _17th_ day of **January, 2017.**

E. SCOTT FROST
**UNITED STATES MAGISTRATE JUDGE**

33